UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF ADAM RANDALL,
by its Special Administrator Richard Randall,

       Plaintiff,

       v.                            Case No. _____

ROCK COUNTY,
AMANDA BEGGS,
VITALCORE HEALTH STRATEGIES, LLC,
WILL GARCIA,
KAYLA KETELBOETER,
FREDERICK VAN VUUREN,
RYAN WHITE,
JENNIFER BLISCHKE,
ABC INSURANCE COMPANY and
DEF INSURANCE COMPANY,

       Defendants.

---

## COMPLAINT

---

NOW COMES THE PLAINTIFF, the Estate of Adam Randall by its Special Administrator Richard Randall, by its attorneys, Gingras, Thomsen & Wachs by Robert J. Gingras, Paul A. Kinne and Peter N. Kelly-Smith, who hereby states the following as its complaint in the above-referenced matter.

### NATURE OF THE PROCEEDINGS

1.    This is a civil rights case brought under 42 U.S.C. §1983, the Fourteenth Amendment to the U.S. Constitution, and state law as a result of the defendants' objectively unreasonable, deliberately indifferent and/or negligent failure to obtain emergency medical

treatment for Adam Randall's objectively serious medical condition while he was in custody of Rock County causing his preventable death.

2.      Well-established constitutional law provides that when the government takes individuals into its custody—so that they are no longer able to take steps to protect their own health—the government must provide adequate medical care to such individuals. *See* Wesley v. Armor Corr. Health Servs., 2022 U.S. Dist. LEXIS 202045, *25 (E.D. Wis. Nov. 7, 2022) ("the Fourteenth Amendment Due Process Clause governs" claims of pretrial detainees for deprivation of medical care); *see also* Miranda v. Cty. of Lake, 900 F.3d 335, 352 (7th Cir. 2018) (same); *see* Estelle v. Gamble, 429 U.S. 97, 103-04 (1976) ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.").

3.      Despite this clearly established law and obvious signs that Adam Randall was experiencing significant medical distress, the defendants watched Adam Randall slowly die—over the course of approximately five days—as a case of bacterial pneumonia developed into septic shock, resulting in Adam Randall's untimely and unnecessary death on February 16, 2025.

## PARTIES

4.      At all times relevant to this action, Adam Randall was an adult resident of the State of Wisconsin. Adam Randall passed away on February 16, 2025. Accordingly, his estate, by its Special Administrator Richard Randall, is the proper plaintiff.

5.      Defendant Rock County is a municipal corporation organized under the laws of the State of Wisconsin, with offices located at 51 South Main Street, Janesville, WI 53545; that at all times material hereto, Rock County operated and maintained the Rock County Jail; that pursuant to Wis. Stat. §895.46, Rock County is vicariously liable for its employees and is liable pursuant to Wis. Stat. § 895.46(1)(a) to pay or indemnify any judgment entered against the individual

employee- or former-employee defendants in this action, including any compensatory and punitive damages, attorney's fees and costs awarded, as said defendants were acting under color of state law and within the scope of their employment when committing the acts described herein.

6. At all times relevant hereto, Defendant Amanda Beggs was a corrections officer employed by Rock County. The conduct attributed to her in the complaint was undertaken recklessly or intentionally, performed under color of law, and within the scope of her employment.

7. Defendant Vitalcore Health Strategies, LLC (Vitalcore) is a foreign company with its principal office located at 719 SW Van Buren Street, Suite 100, Topeka, Kansas 66603. The registered agent for Defendant Vitalcore is Corporation Service Company, which is located at 33 East Main Street, Suite 610, Madison, Wisconsin 53703. At all times relevant hereto, Defendant Rock County had contracted with Defendant Vitalcore for Defendant Vitalcore to provide medical care for individuals housed in the Rock County Jail.

8. At all times relevant hereto, Defendant Will Garcia was employed as a nurse by Vitalcore and provided medical care at the Rock County Jail. The conduct attributed to him in the complaint was undertaken recklessly or intentionally, performed under color of law, and within the scope of his employment.

9. At all times relevant hereto, Defendant Kayla Ketelboeter was employed as a nurse by Vitalcore and provided medical care at the Rock County Jail. The conduct attributed to her in the complaint was undertaken recklessly or intentionally, performed under color of law, and within the scope of her employment.

10. At all times relevant hereto, Defendant Frederick Van Vuuren was employed as a nurse practitioner by Vitalcore and provided medical care at the Rock County Jail. The conduct

3

attributed to him in the complaint was undertaken recklessly or intentionally, performed under color of law, and within the scope of his employment.

11.    At all times relevant hereto, Defendant Ryan White was employed as a nurse by Vitalcore and provided medical care at the Rock County Jail. The conduct attributed to him in the complaint was undertaken recklessly or intentionally, performed under color of law, and within the scope of his employment.

12.    At all times relevant hereto, Defendant Jennifer Blischke was employed as a nurse by Vitalcore and provided medical care at the Rock County Jail. The conduct attributed to her in the complaint was undertaken recklessly or intentionally, performed under color of law, and within the scope of her employment.

13.    ABC Insurance Company is the fictitious name for an unknown insurance company that was engaged in writing and selling a policy of liability insurance covering the conduct of Rock County and Amanda Beggs. Pursuant to Wis. Stat. § 807.12, ABC Insurance Company is being inserted in place of the real or proper defendant, which as soon as their identity is ascertained, will be substituted in place of ABC Insurance Company.

14.    DEF Insurance Company is the fictitious name for an unknown insurance company that was engaged in writing and selling a policy of liability insurance covering the conduct of Vitalcore, Will Garcia, Kayla Ketelboeter, Frederick Van Vuuren, Ryan White, and Jennifer Blischke. Pursuant to Wis. Stat. § 807.12, DEF Insurance Company is being inserted in place of the real or proper defendant, which as soon as their identity is ascertained, will be substituted in place of DEF Insurance Company.

**JURISDICTION AND VENUE**

15.     This court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331 (federal question) as well as 28 U.S.C. §1988 and 28 U.S.C. § 1343 (civil rights). Further, this court has jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     Venue in the Western District of Wisconsin pursuant to 28 U.S.C. § 1391 is proper insofar as the parties are or were located in this district, and the events giving rise took place within this district.

**FACTUAL ALLEGATIONS**

### I.     Adam Randall's Background

17.     Adam Randall was born in Janesville, Wisconsin, in 1983. He was the son of Richard Randall and Lori (Folker) Judd.

18.     During his childhood, Adam had a love for baseball, spending many summer days at the Little League Diamonds.

19.     Adam graduated from Craig High School. He then received an Electrical Power Distribution Diploma from Blackhawk Technical College in 2006.



**Photo 1: Shelf at Richard Randall's home
displaying photos of Adam as well as his trophies and diplomas**

20.    Adam had a daughter (Madelyn Randall), who was the center of his world and who he loved unconditionally.



**Photo 2: Adam with his daughter (Madelyn Randall) on Adam's 39th birthday**

21.    Adam worked as a Journeyman Steamfitter after completing a five-year apprenticeship in 2015. He worked on many large projects throughout the United States and was a member of Steamfitters Local 601.

**II.    Adam Randall's Onset of Symptoms while Incarcerated**

22.    In late September 2024, Randall began a period of confinement at the Rock County Jail as a pretrial detainee.

23.    On February 11, 2025, Adam started exhibiting symptoms of pneumonia, including shortness of breath, chest pain, fever, chills, and cough.

24.     That evening, Adam's cellmate threatened to kill him because Adam's heavy breathing was preventing his cellmate from sleeping. Correctional Officer Wimmer, who removed Adam's cellmate from Adam's cell, described Adam's snoring as sounding "like a freight train."

25.     On February 12, 2025, Adam received a new cellmate, whom Adam immediately informed that he (Adam) was not feeling well.

26.     Around 8:45 PM that evening, Adam told Defendant Jennifer Blischke—who was in Adam's cell block for a medication distribution—that he needed to see a doctor. Despite this, Adam was not taken to the medical unit.



**Photo 3: Adam speaking with Defendant Blischke at 8:45 PM on February 12, 2025**

27. On February 13, 2025, Adam submitted two "Health Care Services Request for Medical Care."

28. In one of his requests, Adam asked to see a nurse and wrote the following: "For the last 2 days my body and joints have ached and I have had times when I was shivering uncontrollably and others when I was sweating."

29. In his other request, Adam asked to see a nurse and wrote the following: "I have a scratch on my head that is infected and not healing for a few days. I would also like an order for Ibuprofen when I need it."

30. At around 4:49 PM that day, Adam told a correctional officer in his cell block that he had submitted two medical requests and asked if he could be seen by nursing staff that evening.



**Photo 4: Adam, at 4:49 PM on February 13, 2025,
asking Correctional Officer Eubanks if he can see medical staff**

31. At around 9:00 PM that evening, during another medication distribution in his cell block, Adam again informed medical staff that he been feeling sick and noted he had submitted two "Health Care Services Request for Medical Care" that day. Adam told medical staff that he

had been experiencing intense neck pain, sweating, and shivering. Despite this, Adam was not taken to the medical unit.

32.    The next morning, on February 14, 2025, Adam was scheduled to go to court.

33.    At approximately 5:40 AM, while he was being escorted from his cellblock to his court appearance, Adam told Correctional Officer Garza that he did not believe he could make it to court. Adam then informed Officer Garza that he was having chest pain and trouble breathing.



**Photo 5: Adam informs Officer Garza, at 5:40 AM on February 14, 2025, that he is experiencing chest pain and shortness of breath**

34.    In response, Correctional Officer Garza decided to bring Adam to the medical unit. As Adam and Correctional Officer Garza walked to the medical unit, Adam stated that he had not slept in two days and that he had been experiencing cold sweats.

35.     When Adam arrived in the medical unit, he was evaluated by Defendant Jennifer Blischke. Adam informed Defendant Blischke that he had been sick for the last three days. Defendant Blischke was dismissive of his complaint.

36.     After evaluating Adam, Defendant Blischke determined that Adam should not go to court since he was not feeling well and decided to admit Adam to the medical unit.



**Photo 6: Defendant Blischke dabbing Adam's head, at 6:19 AM on February 14, 2025, after taking Adam's temperature**

37.     Defendant Blischke's medical notes from that morning detail Adam's complaints regarding shortness of breath and dizziness. Defendant Blischke's notes state that Adam's skin was normal colored but clammy. Further, Defendant Blischke's notes state that Adam underwent an electrocardiogram (EKG), which revealed sinus tachycardia.

### III.   Adam Randall's Time in Medical Unit

38.   Shortly after 8:00 AM on February 14, 2025, Adam was given a cell in the medical unit.

39.   At Rock County Jail, an inmate in the medical unit has similar abilities to leave their cell as an inmate in solitary confinement. An inmate in the medical unit is kept alone in their cell, only being let out for one hour a day or when they have medical visits. While in the medical unit, inmates are given their meals through their cell door by correctional officers.

40.   Inmates housed in the medical unit are supposed to be checked on by correctional staff on a frequent basis to evaluate their condition.

41.   While in the medical unit, Adam continued to experience medical distress, including shortness of breath, a cough, fever, chills, and significant pain in his neck.

42.   At around 11:38 AM, when Defendant Amanda Beggs offered Adam his lunch tray, Adam was initially unresponsive and then declined his lunch.

43.   At around 1:19 PM, Adam asked Defendant Beggs if he could see a doctor or a nurse. Defendant Beggs relayed this request to Defendant Will Garcia and commented that Adam "looked like shit." In response, Defendant Garcia advised that Adam should just lay down and sleep. Adam requested Ibuprofen for his pain but was told he had to wait.

44.   At around 2:49 PM, Adam informed Defendant Beggs that he was having trouble breathing and stated he needed to see a nurse immediately. Defendant Garcia briefly evaluated Adam but then sent him back to his medical unit cell.



**Photo 7: Adam, at 2:49 PM on February 14, 2025, shortly after knocking to get Defendant Begg's attention**

45.    At around 3:29 PM, Adam asked Correctional Officer Wakefield for a bag of ice and to be let out of his cell for a short amount of time because he was feeling so warm that he was going to pass out. Correctional Wakefield let Adam out of his medical unit cell for a short time. As she did so, Adam stated that he needed to go to the hospital. However, Defendant Kayla Koettleboeter stated that he could not go.

46.    At around 4:00 PM, Defendant Frederick Van Vuuren evaluated Adam. During this evaluation, Adam stated he had "not been feeling well at all for 2-3 days." Adam complained of fever/chills, shortness of breath, chest pain, an inability to move his head, as well as a headache. Adam requested to go to the emergency department to get proper help.

12

47. Defendant Van Vuuren's notes from this interaction confirmed that Adam was experiencing inspiratory/expiratory wheezing, shortness of breath, reduced range of motion of his neck, skin inflammation, and continued tachycardia. At the time of this evaluation, Adam had a sitting blood pressure of 168/98 mm Hg, a sitting pulse of 130 bpm, and a temperature of 102.6 degrees Fahrenheit. Defendant Van Vuuren prescribed Adam Ibuprofen, continued Tylenol Electrolyte Supplementation, and Clonidine.

48. Following Defendant Van Vuuren's evaluation, Adam was returned to his medical unit cell, instead of being taken to a hospital like he needed.

49. Defendant Van Vuuren's notes were not appropriately instructive to the rest of the medical staff, considering—for example—Defendant Ryan White continually misconstrued Defendant Van Vuuren's notes while treating Adam.

50. At around 4:36 PM, Correctional Officer Wakefield offered Adam his dinner tray, but Adam was initially unresponsive. Correctional Officer Wakefield entered Adam's cell, finding him wearing no clothes, with just a sheet on him, because he was so warm. Adam then declined his dinner tray, stating that he would throw up if he ate.

51. At around 5:05 PM, Adam reported to Correctional Officer Wakefield and Defendant Garcia that he was experiencing chest pain again. Adam again asked Defendant Garcia if he could go to the hospital and was again denied his request.

52. At around 6:55 PM, Adam's request to take a shower was denied because he had slept through his one-hour opportunity to be out of his medical unit cell.

53. Adam remained in his medical unit cell through the night of February 14 and into the morning of February 15, 2025.

13

54.     At around 5:03 AM on February 15, 2025, Defendant Ryan White briefly evaluated Adam. During this evaluation, Adam requested ibuprofen and ice to manage his neck pain and fever, respectively—but Defendant Ryan White denied both requests.

55.     At around 7:15 AM, Adam informed Correctional Officer Techmeier that his chest hurt and that he could not breathe. Correctional Officer Techmeier relayed this information to Defendant White but also stated that he believed Adam was just trying to get out of his cell.



**Photo 7: Adam, at 7:18 AM on February 15, 2025, informing Correctional Officer Techmeier of his symptoms**

56.     Shortly after 7:20 AM, Defendant White evaluated Adam. Adam told Defendant White yet again that he was not feeling good, that his heart was pounding, and that he was having difficulty breathing. Defendant White advised Adam just to take deep breaths and to wait until his next medication dosage.

57.     At around 7:48 AM, Correctional Officer Techmeier and Defendant Ketelboeter entered Adam's medical unit cell to give Adam his medication. During this interaction,

Correctional Officer Techmeier brought Adam's food tray into his cell. Adam told Correctional Officer Techmeier that he could not eat anything, to which Correctional Officer Techmeier said Adam needed to eat something in order for him to be released from the medical unit. Correctional Officer Techmeier made this statement, then left Adam's cell before confirming Adam intended to eat anything.

58. Throughout the morning of February 15, 2025, Adam complained of his symptoms on several more occasions with each plea being ignored.

59. At around 11:51 AM, Defendant Beggs asked Adam if he would like his lunch tray. In response, Adam once again declined his food tray.

60. At around 12:37 PM, Defendant Beggs and Defendant Garcia learned that other correctional staff wanted to move an inmate on suicide watch into the medical unit. Defendant Beggs and Defendant Garcia then discussed how there was currently no room for this suicidal inmate unless Adam was moved back to his cell block.

61. At around 12:40 PM, Defendant Garcia told Defendant Beggs that Adam was cleared to return to general population, where the degree of observation would be drastically decreased.

62. Defendant Garcia did not evaluate Adam before deciding he could return to his cell block nor did he complete any of the forms necessary to release Adam from the medical unit.

63. Without requesting an explanation from Defendant Garcia or independently considering Adam's obvious medical distress, Defendant Beggs initiated the process of transferring Adam back to his cell block and informed other correctional staff that there was now an open cell in the medical unit.

64.     Defendant Beggs told Adam he could gather his belongings and wait for an escort to his old cell block. As Adam was gathering his belongings, Defendant Beggs could hear Adam audibly wheezing with each movement and yet she willfully ignored his obvious medical distress, allowing him to leave the medical unit.

### IV.     Adam Randall's Worsening Symptoms

65.     At around 12:54 PM on February 15, 2025, Correctional Officer Dodd arrived at the medical unit to escort Adam back to his previous cell block.

66.     Correctional Officer Dodd walked alongside Adam, as Adam carried a tub of his belongings, for the approximate 2 to 3 minutes it took for them to reach Adam's cell block. During this walk, Adam was audibly wheezing and was forced to stop several times to catch his breath.

 

**Photos 8 & 9: Adam walking from the medical unit back to his cell block
at around 12:55 PM on February 15, 2025**

67.     While escorting Adam, Correctional Officer Dodd asked Adam if he was all right on multiple occasions. Adam explained to Correctional Officer Dodd that he has been feeling

16

poorly the last few days and that he had to miss court yesterday due to his illness. When Correctional Officer Dodd asked Adam if he had told medical about these symptoms, Adam confirmed and said that medical had not been helpful. Adam further stated that he wanted to go back to his cell block so he could take a shower.

68.    Shortly after returning to his old cell, Adam spoke with Correctional Officer Diaz about his health concerns. Specifically, at around 1:54 PM, Adam told Correctional Officer Diaz that he did not want to go back down to the medical unit and be on lockdown again but that he needed to go to a hospital. Correctional Officer Diaz informed Adam that the only way he could go to the hospital was if one of the nurses approved it. Adam explained that the nurses were not providing the help he needed and asked if there was a supervisor he could contact. Correctional Officer Diaz stated there was not a supervisor and ended the conversation.



**Photo 10: Adam speaking to Correctional Officer Diaz in the doorway of his cell at 1:54 PM on February 15, 2025**

17

69.     On the evening of February 15, 2025, at around 6:14 PM, Adam called his mother and immediately told her: "I feel like I'm going to die in here." Adam informed his mother that the correctional staff would not take him to the hospital despite his severe symptoms. Adam described being in the medical unit as like a punishment since he was locked down. Adam told his mother, "I can't go back to that medical unit, it's like they want you to die." Adam pleaded with his mother to contact somebody higher up at the Rock County Jail to try to get him the medical help that he needed.

70.     Shortly after this call, at approximately 6:35 PM, Adam's mother called the Rock County Jail seeking help for her son. However, despite waiting on hold for an extensive amount of time, no one answered her call. The following morning, at approximately 8:40 AM, Adam's mother called the Rock County Jail a second time. Again, she waited on hold for an extensive amount of time and, again, no one answered her call.

71.     Later in the evening of February 15, 2025, Adam requested to go to see the nurse because his symptoms had gotten even worse. At around 10:34 PM, Corrections Officer Scheehle escorted Adam to the medical unit. During their three-minute walk Adam had to stop at least four separate times to catch his breath, leaning against the wall to catch himself and stating that he thought he may pass out. Adam commented that his heart was "pounding so bad" and questioned whether seeing the nurse may be a waste of time given his recent experiences in the medical unit.

72.     Adam arrived in the medical unit at around 10:37 PM, where he was seen by Defendant White. Adam stated that he "can't go on like this" and that he needed to go the hospital.

73.     Defendant White then stated to Adam something to the effect of "as a nurse I cannot diagnose you, but if I had to take a guess, I would say it is anxiety." Defendant White then

18

encouraged Adam to stay hydrated and work on deep breathing. In response, Adam stated he cannot do deep-breathing exercises because he will pass out.



**Photo 11: Adam speaking with Defendant White, at 10:41 PM on February 15, 2025, in the medical unit**

74.    Defendant White claimed that there was nothing he could do for Adam and asserted that he was following the medical instructions left for Adam. Adam continued to tell Defendant White that he needed to go to the hospital and stated, "something is seriously wrong." Despite this, Defendant White reasserted there was nothing he could do and excused Adam back to his cell block.

75.    At around 10:45 PM, Corrections Officer Scheehle and Adam walked back to Adam's cell block. Once again, Adam had to stop at least five times to catch his breath and maintain his balance. On three of these five occasions, Adam had to lean his full body weight against a wall to stay upright.

19



**Photo 12: Adam leaning against the wall, at 10:48 PM on February 15, 2025, as he walked back to his cell block with Corrections Officer Scheehle**

76.    Shortly after midnight, on February 15, 2025, Adam again requested medical attention. This time, Defendant White walked to Adam's cell block to evaluate him. Adam requested that he be given the Clonidine that Defendant Van Vurren had prescribed him but which Adam claimed no one had given to him. Defendant White told Adam he had missed his opportunity to take the Clonidine and that he would receive it in the morning. Adam also explained that he could not breathe. Defendant White coyly responded that Adam could breathe considering Adam was speaking. Adam reasserted that he could not breathe when he laid down. Defendant White concluded the interaction and told Adam that he had 400 patients to take care of, so he could not keep coming down to evaluate Adam.

77.    Just before 6:00 AM, on February 16, 2025, Adam and several other inmates were escorted by Corrections Officer White to the medical unit. Adam walked in the back of the group and had to stop at least two times to catch his breath and maintain his balance.

78.    It is not clear if Adam was assessed by any medical staff after arriving at the medical unit, but he was returned to his cell block by 7:10 AM.

79.     At around 7:12 AM, Adam called his father to explain his health problems. Adam explained his health problems to his father as well as the terrible medical system present at the Rock County Jail (*e.g.*, the feeling of being punished in the medical unit, no medical staff informing Adam he was prescribed Clonidine, and not being taken to the hospital). Adam told his father that he was "going to die in here," then asked his father to contact people to try and help him.

80.     At around 11:11 AM, Adam returned to the medical unit alongside other inmates.

81.     For reasons yet unknown, medical staff finally decided to take Adam's medical concerns seriously during this visit to the medical unit.

82.     By approximately 11:24 AM, Defendant Ketelboeter had Adam hooked up to an oxygen tank to assist his breathing. Additionally, correctional staff had called for an ambulance to transport Adam to the emergency room.

83.     As Adam waited for the ambulance to arrive—hooked up to an oxygen tank—he sat in the same seat where hours before Defendant White had told him his breathing problems were just caused by anxiety.



**Photo 13: Adam sitting in the medical unit, at 11:28 AM on February 16, 2025, waiting for the ambulance to transport him to the emergency room**

21

### V.    Adam Randall's Hospitalization and Death

84.    At around 11:30 AM, Emergency Medical Service (EMS) loaded Adam onto a stretcher to transport him to the Emergency Department of the Mercy Health in Janesville, Wisconsin.



**Photo 14: Adam being transported out of the Rock County Jail's medical unit via stretcher at 11:30 AM on February 16, 2025**

85.    Adam arrived at the Emergency Department via ambulance approximately fifteen minutes after being loaded onto the stretcher.



**Photo 15: Adam arriving at the Emergency Department at 11:47 AM on February 16, 2025**

86. Within thirty minutes of Adam arriving at the Emergency Department, a portable chest x-ray was administered, finding indications of sepsis and hypoxia. Medical providers quickly found that Adam had been suffering from bacterial pneumonia.

87. Over the next few hours, Adam developed worsening multi-organ failure, despite medical providers' attempts at treatment.

88. By 6:45 PM, the Rock County Jail began interviewing witnesses related to Adam's "in-custody death."

89. Ultimately, Adam passed away at 10:35 PM on February 16, 2025.

90. Adam's Mercy Health records lists his cause of death as "septic shock due to bacterial pneumonia."

91. Thankfully, Adam was surrounded by his family when he passed away.



**Photo 16: Adam's family members surrounding his hospital bed
shortly after he passed away**

92.     Sadly, officers soon removed Adam's family from his bedside. This included an officer grabbing Adam's mother as she went to embrace her son for a final time.



**Photo 17: Officers removing Adam's family from his beside**

## CLAIMS FOR RELIEF

**First Claim for Relief — 42 U.S.C. §1983**
**Defendant Beggs's Violation of Adam Randall's Fourteenth Amendment Rights**

93.     The plaintiff restates the foregoing paragraphs as if set forth fully herein.

94.     Despite observing Adam Randall's serious and obvious health condition, Defendant Beggs acted objectively unreasonably and was deliberately indifferent to Adam's known and objectively serious medical condition and needs in that she encouraged Adam's discharge from the medical unit to make room for another inmate and was otherwise deliberately indifferent to Adam.

95.     Defendant Beggs's unlawful conduct, including her deliberate indifference to Adam's known and objectively serious medical needs, violated Adam's rights under the Fourteenth Amendment.

24

96. Defendant Beggs's violation of Adam's constitutional rights was a direct and proximate cause of Adam's injuries and death and all of plaintiff's damages.

**Second Claim for Relief — 42 U.S.C. §1983**
**Defendants Garcia, Ketelboeter, Van Vuuren, White, and Blischke's**
**Violation of Adam Randall's Fourteenth Amendment Rights**

97. The plaintiff restates the foregoing paragraphs as if set forth fully herein.

98. Despite observing Adam Randall's serious and obvious health condition, Defendants Garcia, Ketelboeter, Van Vuuren, White, and Blischke acted objectively unreasonably and were deliberately indifferent to Adam's known and objectively serious medical condition and needs in that they continually denied Adam's requests to go to the hospital, repeatedly ignored Adam's description of his symptoms, discharged Adam from the medical unit to make room for another inmate and without the appropriate paper work, denied Adam access to medication he was prescribed, and were otherwise deliberately indifferent to Adam.

99. Defendants Garcia, Ketelboeter, Van Vuuren, White, and Blischke's actions or inactions were "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006).

100. Defendants Garcia, Ketelboeter, Van Vuuren, White, and Blischke's unlawful conduct, including their deliberate indifference to Adam's known and objectively serious medical needs, violated Adam's rights under the Fourteenth Amendment.

101. Defendants Garcia, Ketelboeter, Van Vuuren, White, and Blischke's violation of Adam's constitutional rights was a direct and proximate cause of Adam's injuries and death and all of plaintiff's damages.

**Third Claim for Relief — 42 U.S.C. §1983**
**Defendant Rock County's Violation of Adam Randall's Fourteenth Amendment Rights**

102. The plaintiff restates the foregoing paragraphs as if set forth fully herein.

25

103. Defendant Rock County had a non-delegable duty to provide adequate medical care to inmates and pretrial detainees, and contracting out some medical care to a private entity—like Defendant Vitalcore—did not relieve it of its constitutional duty to provide adequate medical care and treatment to those in its custody.

104. Defendant Rock County has a widespread custom or practice of deliberately ignoring or otherwise failing to treat inmates' serious and obvious medical conditions. Defendant Rock County does not have policy to allow inmates or their family members to obtain a second medical opinion when an inmate's medical needs are not being met.

105. Defendant Rock County's violation of Adam's constitutional rights was a dire and proximate cause of Adam's injuries and death and all of the plaintiff's damages.

### Fourth Claim for Relief — Negligence Against Defendants Garcia, Ketelboeter, Van Vuuren, White, and Blischke

106. The plaintiff restates the foregoing paragraphs as if set forth fully herein.

107. By taking Adam Randall into custody, defendants undertook and owed Adam the duty to make reasonable efforts to care for him in a reasonably prudent manner, to exercise due care and caution, and to follow the ministerial duty to obtain prompt care under these circumstances under the common law as it relates to persons in their custody who are unable to care for themselves or seek medical attention while in custody.

108. Despite these duties as well as their knowledge of Adam's serious and obvious health condition, the defendants took no action to obtain or implement the medical care Adam required.

109. Defendants breached their duty of reasonable care to Adam and acted in a manner that was extremely negligent, careless, reckless and without concern for his basic medical needs and safety.

26

110.    Defendants' negligent, careless, and reckless disregard for Adam's safety and wellbeing was a cause of Adam's pain and suffering and death and all of plaintiff's damages.

**Fifth Claim for Relief —Wrongful Death**
**Against Defendants Garcia, Ketelboeter, Van Vuuren, White, and Blischke**
**Under Wis. Stat. §895.04**

111.    The plaintiff restates the foregoing paragraphs as if set forth fully herein.

112.    That as a result of the wrongful conduct alleged herein, and the resulting injuries and death of Adam Randall, as set forth above, plaintiff was injured and sustained wrongful death damages, including pre-death pain and suffering, funeral and burial expenses, loss of society and companionship and loss of consortium damages, and all other damages allowed under state law in an amount to be determined at a trial of this matter.

**Sixth Claim for Relief —Vicarious Liability of Vitalcore**

113.    The plaintiff restates the foregoing paragraphs as if set forth fully herein.

114.    At all times material hereto, Defendants Garcia, Ketelboeter, Van Vuuren, White, and Blischke's were employees of Defendant Vitalcore and at all times material hereto were acting within the scope of their employment with said defendant.

115.    Defendants Garcia, Ketelboeter, Van Vuuren, White, and Blischke were causally negligent as alleged above.

116.    Defendant Vitalcore is vicariously liable under *respondeat superior* and/or the doctrine of principal and agent for the negligent and unlawful acts of Defendants Garcia, Ketelboeter, Van Vuuren, White, and Blischke as alleged herein, and is therefore liable to the plaintiff for all of his damages.

**Seventh Claim for Relief — Punitive Damages against all Individual Defendants**

117.    The plaintiff restates the foregoing paragraphs as if set forth fully herein.

27

118.    The above-described conduct of the individual defendants was done maliciously and/or with intentional disregard of the rights of Plaintiff Adam Randall.

**WHEREFORE**, the plaintiff demands the following relief:

A.    An award of compensatory damages against the defendants that will justly compensate the plaintiff for his losses;

B.    An award of punitive damages against the individual defendants;

C.    An award of plaintiff's reasonable attorneys' fees and costs incurred in this action;

D.    Pre- and post-judgment interest; and

E.    Such other relief as the Court deems just and appropriate.

The plaintiff respectfully requests that this matter be tried before a jury of six (6) competent persons.

Dated this 3rd day of June, 2026.

> **GINGRAS THOMSEN & WACHS LLP**
> Attorneys for Plaintiff
>
> *s/ Paul A. Kinne*
> PAUL A. KINNE
> State Bar Number: 1021493
> ROBERT J. GINGRAS
> State Bar Number: 1002909
> PETER N. KELLY-SMITH
> State Bar Number: 1128245
>
> 8150 Excelsior Drive
> Madison, WI 53717
> Phone: (608) 833-2632
> Fax: (608) 833-2874